709 F.2d 782
 Maria DOE and Cruz Doe, individually and on behalf of their
minor son Manual Doe, Plaintiffs,
and
Anna Doe, Plaintiff-Appellant,
v.
NEW YORK CITY DEPARTMENT OF SOCIAL SERVICES, et al., Defendants,
and
Catholic Home Bureau, Defendant-Appellee.
 No. 590, Docket 82-7505.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 27, 1983.
Decided June 2, 1983.
 
 Carolyn Kubitschek, Edward N. Simon, New York City, David J. Lansner, Lansner & Wendt, New York City, Louise Gruner Gans, New York City, for plaintiff-appellant.
 Frederick J. Magovern, New York City, for defendant-appellee.
 Before OAKES, KEARSE and SLOVITER,* Circuit Judges.
 SLOVITER, Circuit Judge:
 
 
 1
 Appellant Anna Doe's claim under 42 U.S.C. Sec. 1983 (Supp. IV 1980) against the Catholic Home Bureau ("the Bureau") comes before this court for the second time. On the first appeal, we reversed the judgment entered on the jury verdict for the defendant Bureau and remanded the case for a new trial because the jury instructions were misleading and because certain evidentiary rulings were erroneous. Doe v. New York City Department of Social Services, 649 F.2d 134 (2d Cir.1981) (Doe I ). After the jury found for plaintiff at the new trial and assessed damages at $225,000, Judge Brieant, the trial judge, United States District Court for the Southern District of New York, entered judgment notwithstanding the verdict in favor of the defendant Bureau. The judge rejected plaintiff's argument that she was entitled to the jury verdict under this court's earlier decision. Instead, the trial court held the evidence was so overwhelming that no reasonable jury could find the Bureau acted with deliberate indifference, the standard used to establish liability under the section 1983 claim at issue. Plaintiff appeals the entry of judgment in favor of the Bureau; we reverse and remand for reinstatement of the jury verdict.
 
 I.
 BACKGROUND
 A.
 Facts
 
 2
 Because this case reaches us on appeal from a judgment notwithstanding the jury's verdict for the plaintiff, we must view the evidence in the light most favorable to the plaintiff who "must be given the benefit of all reasonable inferences which may be drawn in [her] favor from [the] evidence." Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir.1970).
 
 
 3
 Anna Doe, born in 1961, was two years old when she was placed in foster care along with her sister. The New York City Commissioner of Welfare, their legal custodian, arranged for defendant Catholic Home Bureau to supervise their care beginning January 5, 1964. The Bureau placed the girls with Mr. and Mrs. Senerchia, having previously investigated and certified them as suitable for foster placements. The Bureau placed two additional foster children with them in 1965.
 
 
 4
 The record contains evidence that Anna was regularly and frequently physically and sexually abused by Mr. Senerchia, her foster father, starting in 1971 when she was about ten or eleven years old. The physical abuse consisted, inter alia, of beating her over her entire body with his hands and with a belt, throwing her down the stairs and even once cutting her with a hunting knife. Beginning at the same time when Anna was ten or eleven, and continuing for more than six years, Mr. Senerchia forced Anna to have intercourse and oral sexual relations with him. He had threatened Anna she would be institutionalized if she told anyone of his actions.
 
 
 5
 The Bureau took decisive action only after Mrs. Senerchia reported to the Bureau in August 1977 that she had recently discovered Mr. Senerchia and Anna in bed together. On receipt of this information, the Bureau barred Mr. Senerchia from returning home and the Bureau reported the abuse to the appropriate city authority, the Confidential Investigation Unit. Shortly thereafter, one of Anna's foster sisters reported that she had also been physically and sexually abused by Mr. Senerchia. The Confidential Investigation Unit corroborated the occurrence of abuse of Anna. It is undisputed that prior to August 1977, the Bureau did not report any suspected abuse either to the New York City Department of Social Services or to the Confidential Unit.
 
 
 6
 In this law suit, filed in April 1979, Anna claims that the Catholic Home Bureau violated her constitutional right to be kept free from harm. She alleges that the Bureau's failure to supervise her placement adequately and to report her situation to the New York City Department of Social Services as a case of suspected child abuse led to continuation of her mistreatment. Plaintiff contends that the Bureau had violated specific duties imposed by New York law; that it had enough information beginning at least in early 1975 to give it actual or constructive notice of the abuse to which Anna was being subjected; and that the Bureau was grossly negligent and deliberately indifferent to Anna's physical well-being in failing to act, resulting in Anna's continued abuse.
 
 
 7
 To support the jury's verdict, which depended on a finding of deliberate indifference to plaintiff's needs, plaintiff relies primarily on events beginning in early 1975. The case records evince some earlier concerns. There are notations about Mr. Senerchia's unusual dominance within the family, the difficulty of dealing with him, the suspicion that Mr. Senerchia had severe emotional problems, the difficulties which Mr. and Mrs. Senerchia placed in the path of workers seeking to see Anna alone, and the Senerchias' practice of often answering questions directed to Anna. Nonetheless the early case records were generally positive about the family environment.
 
 
 8
 However, in January 1975, when Anna was in the eighth grade, specific information of a problem was communicated to Sister Una McCormack, the Bureau's executive head. A priest told her that Mr. Senerchia had taken Anna out of her school allegedly because "Anna was sexually acting out in school" with other children, and was attempting to get her into parochial school. Sister Una directed that Anna be seen by Dr. Lewis, a Bureau psychologist. Ms. Crowe, the supervisor of the Staten Island office which was handling Anna's case, contacted Mr. Senerchia regarding this appointment. Mr. Senerchia repeated the allegation of frequent sexual activity to Ms. Crowe, and stated that Anna, upon his prodding, had confessed to sexual involvement with other school children including actual intercourse occurring since the first grade. These activities allegedly occurred during school hours in empty classrooms, hallways, the gym and the cafeteria. The case records of conversations of Bureau personnel with Mr. Senerchia note that he seemed eager to give details of this sexual activity and that he seemed to derive some satisfaction from recounting the matter. Mr. Senerchia insisted that his wife not be told and that the Bureau not approach the school.
 
 
 9
 Ms. Moroney, Ms. Crowe's supervisor, visited the Bureau's branch office, read the case record and discussed the situation. Ms. Moroney took the case record containing background information on the Senerchia family to Dr. Lewis. Dr. Lewis was informed that Anna had been "engaging in sexual activity with classmates." Dr. Lewis, however, did not read the case record before interviewing Anna and Mr. Senerchia. During this interview on January 9, 1975, Anna admitted to "sexual play" with other children and evinced anxiety about the repercussions the episode might have on the possibility of her adoption by the Senerchias. Dr. Lewis' impression was that Anna had probably been engaging in some "sex play" and concluded, after spending 15 minutes with Mr. Senerchia, that he seemed to be a concerned and warm parent. She recommended that Anna be transferred to a more appropriate educational setting, but that the foster home placement be maintained. Dr. Lewis and the Bureau's personnel agreed, after conferring, that Anna should not return to the school she had been attending. Significantly, on learning of Mr. Senerchia's allegation, no one from the Bureau contacted the school where Anna had allegedly engaged in these active and frequent sexual activities either to corroborate Mr. Senerchia's story or to see what light the school authorities could shed.
 
 
 10
 Shortly thereafter, Dr. Lewis made an up-to-date psychological evaluation of Anna to measure her intelligence for purposes of educational placement, since the Bureau was seeking to have Anna placed in a special class for the mentally handicapped. A representative of the City's Bureau of Child Guidance told Anna's caseworker that Anna's test results were above the ceiling for placement in a mentally handicapped class. The caseworker informed that representative at the City's Bureau that Anna's foster father had removed her from school, but did not give the reason. The Catholic Bureau then considered trying to place Anna in a special class for the emotionally handicapped. Since such a placement required a psychiatric evaluation in addition to the psychological evaluation performed by Dr. Lewis, Anna was scheduled to see Dr. de Alvarado, an agency psychiatrist, on March 5, 1975, and Mr. and Mrs. Senerchia were requested to attend. A staff conference on Anna's case was held in late February at Dr. de Alvarado's request. The March 5, 1975 appointment was cancelled because Mr. Senerchia had been hospitalized, but Dr. de Alvarado saw Anna alone on March 19th.
 
 
 11
 Dr. de Alvarado testified that she had carefully read the case history and felt something did not add up. Upon questioning Anna, she did not believe the details of Anna's sexual involvement with other school children. She asked Anna directly if she was sexually involved with Mr. Senerchia. Although Anna did not answer, Dr. de Alvarado knew that a great majority of abused children deny occurrence of such abuse. Dr. de Alvarado reached the judgment that sexual abuse was occurring, which she based upon her reading of the case history and her observation of Anna during the interview, including Anna's tearful reaction to the question about sexual involvement with her foster father. After the interview, the psychiatrist called a conference that same day with Ms. Crowe and others and, as Dr. de Alvarado testified, "very explicitly said to them that I thought there was sexual abuse in that home and that she [Anna] should be removed so that they could explore" the situation. Dr. de Alvarado testified that she "thought it was a crisis situation." Her report recommended removal from the foster home and placement in a residential structured situation.
 
 
 12
 Although Dr. de Alvarado had alerted the Bureau personnel to her views on March 19, 1975, no immediate action was taken by them. Dr. de Alvarado was requested by the Bureau to delete references to any suspected sexual relationship from her written report, apparently so that the report could be used by those outside the Bureau for school placement purposes, and she did so. An administrative review in the Bureau was not held until April 10, 1975, when Ms. Maroney, Mr. Galano, Special Services Coordinator, Ms. Crowe, and Ms. Klages, Anna's caseworker, met and agreed, as set forth in the case records, that "a continuing effort should be made to get Anna into a school" and that "Mr. Senerchia's involvement with Anna should be further investigated." Nonetheless, the Bureau undertook no such investigation on its own, nor did it request an investigation by others. No one from the Bureau reported suspected abuse to the Confidential Investigation Unit, although only the month before there had been a memorandum to child care agencies from the City emphasizing that "[i]t is imperative that diligent reporting" of abuse be made. Doe I, 649 F.2d at 148 n. 13. Furthermore, no home visits were made between November 12, 1974 and May 12, 1975, and Anna, who had previously been classified as having borderline intelligence, remained out of school for the semester.
 
 
 13
 The truant officer from Anna's school became concerned about Anna's absence. After learning Mr. Senerchia's asserted reason for removing Anna from school, the truant officer telephoned the Bureau in April 1975 and told the caseworker that "this [Mr. Senerchia's allegations] could not be occurring" because the school "is not ... haphazardly run", Anna could not have been cutting classes, and there were no empty storerooms or classrooms where the alleged activity could have taken place. The school's principal called the Bureau shortly thereafter to report he had investigated and confirmed that Anna had not been cutting class. When the caseworker finally saw Mr. Senerchia on May 12, 1975 and questioned him about his allegations, Mr. Senerchia gave a version which the caseworker noted "differ[ed] greatly from the version Mr. S. originally gave."
 
 
 14
 In May 1975, Anna was examined concerning her school placement by Dr. Davis, a consultant psychiatrist for the City's Board of Child Guidance. The Bureau did not inform Dr. Davis of Dr. de Alvarado's assessment of Mr. Senerchia's involvement with Anna. Dr. Davis advised against a residential placement but felt Anna needed a special slow class. When Anna finally resumed school in the fall, she attended a parochial school rather than the special classes for which the Bureau had been waiting the prior semester.
 
 
 15
 On June 6, 1975, the Bureau submitted its annual report to the City. It did not mention Mr. Senerchia's withdrawal of Anna from school, Dr. de Alvarado's suspicions and recommendation, or the allegations of Anna's sexual activity in school, although these events had occurred in the year covered by the report. Nor did the Bureau probe further based on the information at hand. Instead, the Bureau transferred the case to a different office supervisor (Ms. Gambino) and caseworker (Ms. Dellaverson) in the summer of 1975 because of "the complications surrounding [the] case" and "in an effort to move away from the historical relationship (or lack of) that exists between [the Senerchia family] and unit staff." Ms. Dellaverson was never instructed to investigate the possible sexual involvement of Anna with her foster father. She testified that she visited the Senerchia home every three weeks or so. The case records do not reflect any visitations between September 14, 1976 and April 1, 1977, another critical period.
 
 
 16
 In September 1976, Mr. Senerchia informed the Bureau that Anna's foster sister had been "sexually acting out" in a fashion similar to his reports about Anna. He removed the foster sister from school. Ms. Dellaverson told her supervisor, Ms. Gambino, that she felt this was a "repetition syndrome" and Ms. Gambino "felt there was something abnormal here." Nonetheless, this new and troubling development did not evoke any suspected child abuse report by the Bureau.
 
 
 17
 Because the Senerchias were planning to adopt Anna and her sister, Ms. Dellaverson and Ms. Gambino decided that a psychiatrist should interview the Senerchias, Anna, and her sister before proceeding with the adoption. The Senerchias initially resisted a psychiatric visit, but were finally seen in March 1977 by a Catholic Bureau psychiatrist, Dr. Piana. Ms. Dellaverson testified that she did not think she told Dr. Piana about Dr. de Alvarado's suspicions or that the children had been taken out of school. Although Dr. Piana testified at the trial that he had reviewed the highlights of the case record, this recollection was in conflict with his previous deposition testimony that he had read only a two page case summary before his interview rather than the entire case record. This summary mentioned that Anna and her foster sister had been involved in "sexual acting out" at school, but did not state that Anna had been removed from school and did not refer to Dr. de Alvarado's suspicions. Dr. Piana found no psychiatric contra-indications to the Senerchias adopting Anna and her sister. There was no testimony that he had asked the girls about sexual abuse at home, even though he was aware of the reports of Anna's sexual acting out in school. His testimony indicated a disinclination to questioning about sexual involvement at home. It is not clear from the record whether the Bureau provided Dr. Piana with a copy of Dr. de Alvarado's earlier report.
 
 
 18
 In the summer of 1977, Mr. Senerchia informed the Bureau he was going to divorce Mrs. Senerchia and planned to marry a young woman whose child he had fathered. After Mrs. Senerchia learned of her husband's plan to divorce her, she went to the Bureau in August 1977 with Anna and reported she had found Anna and Mr. Senerchia in bed together. The record indicates that the Bureau then acted promptly in reporting the abuse to authorities and in moving to protect the girls.
 
 B.
 Liability
 
 19
 The Bureau does not contest that 42 U.S.C. Sec. 1983 applies to it. As a placement agency, it had various statutory and contractual obligations. It was charged by state law with the task of annually recertifying the Senerchia home. See Doe I, 649 F.2d at 137. The Bureau also had a contractual agreement with the Department of Social Services of the City of New York by which it undertook, inter alia, to supervise the foster home, to provide appropriate comprehensive services, and to submit periodic reports concerning the placement so that the City could monitor the situation. Plaintiff's evidence showed, however, that there were some lengthy periods when no Bureau personnel visited the Senerchia home, and that these gaps came at critical times under the events of this case. Furthermore, the Bureau failed to submit comprehensive and timely reports. Finally, and most importantly, as noted in Doe I, N.Y.Soc.Serv.Law Sec. 413 (McKinney Supp.1982) "imposed a strict duty on the agency to report all suspected cases of child abuse to the Department of Social Services." 649 F.2d at 145 & n. 8 (emphasis added). The duty of agencies supervising a foster home to report suspected child abuse was reiterated on March 5, 1975 in a memorandum by Assistant Commissioner Parry which emphasized that "[i]t is better, by far, in the best interests of the children we are mandated to protect, to err on the side of reporting cases which may be unfounded, than not to report and thereby endanger our children." Doe I, 649 F.2d at 148 n. 13. Although the Bureau's staff psychiatrist, Dr. de Alvarado, explicitly stated she suspected sexual activity between Anna and her foster father, the Bureau transmitted no report of suspected abuse.
 
 
 20
 In Doe I, we reversed the trial court's entry of judgment for the defendant. We held that the jury had not been properly instructed with regard to the meaning of "deliberate indifference", the standard of liability. The trial court had erroneously conveyed "an impression of deliberate indifference requiring a higher degree of knowledge, ill-will and culpability than is actually the case." 649 F.2d at 142. Moreover, "[i]t failed to explain to the jury that repeated acts of negligence could be evidence of indifference." Id. We furthermore noted that gross negligence and deliberate indifference are "closely associated" and that the former "creates a strong presumption" of the latter. Id. at 143 (footnote omitted). We found that the trial court erred by instructing the jury that plaintiff had to show that the Bureau had actual and specific knowledge of Anna's mistreatment. Id. at 144-45. We stated liability under section 1983 could be established if supervisory personnel "exhibited deliberate indifference to a known injury, a known risk, or a specific duty." Id. at 145. We also held that the trial court erroneously excluded certain evidence, such as parts of the Parry memorandum and evidence of abuse of Anna's foster sister, and that the trial court erred in admitting certain other evidence of dubious relevance without cautionary instruction.
 
 
 21
 After the second trial, the jury returned a verdict for the plaintiff and assessed damages at $225,000. The trial court set aside the verdict and rejected plaintiff's argument that the holding in our prior opinion negated its power to rule on a motion for judgment notwithstanding the verdict. The trial judge also held that the evidence was so overwhelming that no reasonable jury could have concluded the Bureau acted with deliberate indifference, although he believed there was evidence of negligence. He stated, however, that if his determination was reversed on appeal, the damage award was proper. No cross-appeal was taken from this latter determination. Plaintiff appeals the grant of defendant's motion for judgment notwithstanding the verdict.
 
 II.
 DISCUSSION
 
 22
 There are two primary issues on appeal[1]: (1) the application of the law of the case doctrine and (2) whether the evidence was so overwhelming that no reasonable jury could find the Bureau acted with deliberate indifference, thereby justifying entry of judgment n.o.v.
 
 A.
 Law of the Case
 1. Mandate of Prior Decision
 
 23
 Under one prong of the law of the case doctrine, "When an appellate court has once decided an issue, the trial court, at a later stage of the litigation, is under a duty to follow the appellate court's ruling on that issue." United States v. Cirami, 563 F.2d 26, 32 (2d Cir.1977); see 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 4478, at 792-93 (1981). This doctrine applies to issues that have been decided "either expressly or by necessary implication." Munro v. Post, 102 F.2d 686, 688 (2d Cir.1939); see Fogel v. Chestnutt, 668 F.2d 100, 108 (2d Cir.1981), cert. denied, --- U.S. ----, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982). Thus if, in Doe I, we decided that there was sufficient evidence to present a jury question on liability under section 1983, that holding would be binding on the lower court.[2]
 
 
 24
 In arguing that we did in fact hold a jury question on liability existed which precluded the district court from overturning the jury verdict, appellant relies particularly on the following language:
 
 
 25
 Defendant argues that any errors committed by the trial court would have been harmless because plaintiff's case was so weak that it should never have gone to the jury. We disagree. This is a complicated and difficult case. Whether the Catholic Home Bureau's omissions were the product of deliberate indifference and proximately caused any portion of Anna's abuse were questions of fact to be resolved by the jury.
 
 
 26
 649 F.2d at 149.
 
 
 27
 The Bureau characterizes this passage as mere dicta. We do not so regard it. Although the decision to remand for a new trial was based on a finding that certain jury instructions and evidentiary rulings were erroneous, the plain language quoted above indicates that the sufficiency of the evidence question was presented to and decided by the earlier panel. Furthermore, 28 U.S.C. Sec. 2111 (1976) directs appellate courts to disregard harmless error.[3] It would have been unnecessary to remand for a new trial because of erroneous jury instructions and evidentiary rulings if plaintiff's evidence on liability (including that proffered and improperly excluded) was insufficient under section 1983 as a matter of law.[4] It is therefore clear that Doe I held plaintiff presented sufficient evidence to go to the jury. Accordingly, resolution of the sufficiency issue became part of the law of the case.
 
 
 28
 There is some authority in other circuits which would permit the district court to enter a directed verdict or j.n.o.v. if there was substantially different evidence at the second trial. See, e.g., Otten v. Stonewall Insurance Co., 538 F.2d 210, 212 (8th Cir.1976); Johnson v. Bernard Insurance Agency, 532 F.2d 1382, 1383-84 (D.C.Cir.1976); Pyramid Life Insurance Co. v. Curry, 291 F.2d 411, 414 (8th Cir.1961).
 
 
 29
 We need not decide whether to adopt that precedent here, see United States v. Fernandez, 506 F.2d 1200, 1202-03 (2d Cir.1974) (trial court has no power to alter mandate of the appellate court based on "new evidence"), because we reject the Bureau's contention that there was substantially different evidence presented at the second trial of this case. We have examined the records of both trials and conclude the evidence at the second trial was not substantially or materially different. The core of plaintiff's case pertinent to the issue of deliberate indifference was very similar at both trials and, if anything, was probably stronger at the second trial.[5] Although the defendant Bureau called several new witnesses at the second trial, there was little, if any, material new evidence that would justify departure from the law of the case.[6] Merely cumulative evidence does not constitute such a justification. See First National Bank v. Material Service Corp., 597 F.2d 1110, 1116 (7th Cir.1979).
 
 
 30
 2. Reconsideration of Prior Appellate Decision
 
 
 31
 Appellee Bureau urges that if we find the prior decision controlling on the district court, we should nevertheless reconsider it. A second prong of the law of the case doctrine, however, encompasses "adherence by an appellate court to its own decision at an earlier stage of the litigation." United States v. Cirami, 563 F.2d 26, 33 n. 6 (2d Cir.1977). As we have noted on numerous occasions, we view this aspect of the law of the case doctrine as one of sound, albeit not inexorable, practice. See, e.g., Rolf v. Blyth, Eastman Dillon & Co., 637 F.2d 77, 87 (2d Cir.1980); Crane Co. v. American Standard, Inc., 603 F.2d 244, 248 (2d Cir.1979) (Crane III ); United States v. Fernandez, 506 F.2d 1200, 1203 (2d Cir.1974). Accord Insurance Group Committee v. Denver & Rio Grande Western Railroad Co., 329 U.S. 607, 612, 67 S.Ct. 583, 585, 91 L.Ed. 547 (1947). We have repeatedly stated we will not depart from this sound policy absent "cogent" or "compelling" reasons. See, e.g., United States v. Fernandez, 506 F.2d at 1203-04; Dale v. Hahn, 486 F.2d 76, 81 (2d Cir.1973), cert. denied, 419 U.S. 826, 95 S.Ct. 44, 42 L.Ed.2d 50 (1974). The major grounds justifying reconsideration are "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 4478, at 790 (1981) (footnote omitted); see Melong v. Micronesian Claims Commission, 643 F.2d 10, 17 (D.C.Cir.1980); White v. Murtha, 377 F.2d 428, 431-32 (5th Cir.1967).
 
 
 32
 In the previous section we discussed and rejected the Bureau's new evidence claim. We similarly reject the Bureau's characterization of the prior appellate decision as clear error leading to manifest injustice.[7]
 
 
 33
 We turn then to the Bureau's claim that the intervening decision in Youngberg v. Romeo, --- U.S. ----, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), has altered the applicable standard of liability under section 1983.[8] Romeo involved a section 1983 damage suit. The Court held that mentally retarded persons involuntarily confined in a state institution for the retarded have substantive rights under the due process clause of the Fourteenth Amendment. The Court stated that professional caretakers violate these rights "only when the decision by the professional is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. 102 S.Ct. at 2462 (footnote omitted). In so stating, the Court adopted what is essentially a gross negligence standard.
 
 
 34
 Even if the Romeo standard of liability is applicable outside of an institutional setting, it is not more favorable to the Bureau than the deliberate indifference test which was applied in Doe I. The deliberate indifference test stemmed from the decision in Estelle v. Gamble, 429 U.S. 97, 104-05, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), where the Court held that deliberate indifference to a prisoner's serious medical needs constituted cruel and unusual punishment under the Eighth Amendment and stated a cause of action under section 1983. The Romeo Court, however, stated that it was error to apply the deliberate indifference standard when considering the due process rights of retarded persons involuntarily committed. 102 S.Ct. at 2456 n. 11. Such persons are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." 102 S.Ct. at 2461 (citing Estelle v. Gamble, 429 U.S. at 104, 97 S.Ct. at 291). Thus the standard of liability which Anna was required to meet in this case may have been stricter than that suggested by the Romeo opinion. Consequently, we reject the Bureau's assertion that the Romeo decision has effected a change in the controlling law so as to make our prior decision clear error,[9] and hold that the plaintiff was entitled to her jury verdict under the law of the case.
 
 B.
 
 35
 Propriety of Judgment n.o.v.
 
 
 36
 Alternatively, we hold that entry of judgment n.o.v. for the defendant Bureau was unwarranted because the record contains sufficient evidence from which a jury could reasonably find deliberate indifference. The standard for grant of judgment n.o.v. has been recently articulated as follows:
 
 
 37
 [T]he trial court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury. Rather, after viewing the evidence in a light most favorable to the non-moving party (giving the non-movant the benefit of all reasonable inferences), the trial court should grant a judgment n.o.v. only when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.
 
 
 38
 Howes v. Great Lakes Press Corp., 679 F.2d 1023, 1030 (2d Cir.) (quoting Mattivi v. South African Marine Corp., "Huguenot", 618 F.2d 163, 167-68 (2d Cir.1980)), cert. denied, --- U.S. ----, 103 S.Ct. 452, 74 L.Ed.2d 605 (1982). The trial court in this case premised its decision on the second ground referred to in Howes. It relied particularly on the facts that Bureau personnel had often visited the plaintiff and the foster home and had provided or arranged for many general services for Anna's care, such as tutoring and medical services, and furthermore that Anna expressed no discontent with her placement and, to the contrary, indicated her desire for adoption. The judge characterized as at most "mere negligence", "poor judgment" or "somewhat careless" the Bureau's failure to comply with periodic reporting requirements, its failure to visit the foster home during at least two lengthy periods and its failure to report Dr. de Alvarado's suspicions of sexual abuse which the judge considered to be "almost equal to a guess." In so ruling, the court usurped the function of the jury.
 
 
 39
 In Doe I we stated that an agency could be held liable under section 1983 if "its top supervisory personnel ... exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution." 649 F.2d at 145. In Doe I we referred to two separate theories of liability which could be applied here. One theory is predicated on the Bureau's failure to comply with specific statutory duties, such as to report all suspected child abuse to the Department of Social Services.[10] Id. at 145 & n. 8. This duty was characterized as "specific" and "unequivocal", and the Bureau's failure to act furnished a plausible basis for the jury to infer deliberate indifference. We also held that liability could be based on inferring deliberate unconcern "from a pattern of omissions revealing deliberate inattention to specific duties imposed for the purpose of safeguarding plaintiffs from abuse." Id. (citation omitted). Moreover, the failure to report could be taken as "incremental documentation of a pervasive pattern of indifference."[11] Id. at 146 (footnote omitted).
 
 
 40
 The fact that the agency may have been attentive to Anna's general care and provided Anna with general services did not preclude a jury finding of deliberate indifference respecting one very significant aspect of her welfare, the protection from abuse. See Murrell v. Bennett, 615 F.2d 306, 310 n. 4 (5th Cir.1980) (one episode of gross misconduct with respect to prisoner's medical care not necessarily excused by general pattern of attentiveness). Furthermore, although Anna's silence about her abuse is uncontested, the record contains expert testimony that abused children typically do not come forward and usually wish to remain in the home. Even defendant's expert agreed that plaintiff's desire for adoption was not inconsistent with her having been physically or sexually abused. The jury could infer that childcare professionals should know this fact, especially when their own expert psychiatrist informs them she believes abuse is occurring[12] and the child is viewed as passive and of limited intelligence by agency personnel. None of the facts relied on by the trial court justified its overriding of the jury's verdict.
 
 
 41
 A reasonable jury could have inferred deliberate indifference by the Bureau from the following evidence: the failure to report suspected child abuse to relevant authorities after being informed in March 1975 of Dr. de Alvarado's opinion, especially when viewed against a background of unusual circumstances surrounding Mr. Senerchia's removal of Anna from school; the failure after the April 10, 1975 staff conference to carry out any further investigation of possible sexual abuse; the failure to verify Mr. Senerchia's allegations of Anna's sexual acting out in school with school authorities; the failure to take action after school officials informed the Bureau that the events described by Mr. Senerchia could not have transpired and after Mr. Senerchia changed his story significantly; acquiescence in Anna's remaining out of school for an entire semester; the failure to conduct any home visits between December 1974 and May 1975; the failure to report Anna's school absence, alleged sexual acting out or Dr. de Alvarado's abuse suspicion in the June 1975 annual report to the Department of Social Services; the failure to take decisive action in 1976 when Mr. Senerchia reported markedly similar sexual acting out by Anna's foster sister; and the failure either of Bureau personnel to provide Dr. Piana with adequate information or the failure of Dr. Piana, in light of the information given, to question Anna concerning sexual abuse in his March 1977 interview. As an appellate court, we do not sit to evaluate the validity or plausibility of the Bureau's explanations for its actions. There was sufficient evidence for the liability issue to be presented to the jury, and the jury made its decision.
 
 III.
 
 42
 We conclude that the law of the case established by the earlier appellate decision in Doe I precluded entry of a judgment n.o.v. for the defendant at the second trial and that no compelling reason has been established to justify our reconsideration of that decision. In any event, entry of judgment n.o.v. was erroneous because there was sufficient evidence for a jury finding of liability under section 1983.
 
 
 43
 Consequently, we reverse and remand for reinstatement of the jury verdict.
 
 
 
 *
 Of the United States Court of Appeals for the Third Circuit, sitting by designation
 
 
 [1]
 We reject the Bureau's additional contention that this court lacks jurisdiction under Fed.R.App.P. 4(a). The district court entered judgment n.o.v. for the Bureau on June 4, 1982 and subsequently granted plaintiff's motion for reargument but adhered to its original decision on June 24, 1982. The notice of appeal, filed June 30, 1982, was timely, and it was not error for plaintiff to have designated the appeal as from the June 4, 1982 entry of judgment
 
 
 [2]
 This contrasts with Borger v. Yamaha International Corp., 625 F.2d 390 (2d Cir.1980), where the appellant had not preserved the sufficiency of the evidence issue. We ordered retrial because of trial errors and explicitly reserved consideration of the sufficiency issue, stating the law of the case doctrine would not prevent appellate review of the evidence after retrial. Id. at 395
 
 
 [3]
 That section provides in pertinent part: "On the hearing of any appeal ..., the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."
 
 
 [4]
 Similar reasoning was used by the court in Pyramid Life Ins. Co. v. Curry, 291 F.2d 411, 413 (8th Cir.1961). See also Otten v. Stonewall Ins. Co., 538 F.2d 210, 213 (8th Cir.1976) (when earlier panel remanded for new trial based on erroneous jury instructions and rejected appeal of j.n.o.v. motion in a footnote, that opinion was construed as reaching sufficiency of the evidence question because court would not otherwise have reached new trial issue)
 
 
 [5]
 For example, the evidence concerning Mr. Senerchia's 1976 allegations about the sexual acting out of Anna's foster sister which had been erroneously excluded from the first trial was introduced in the second trial
 
 
 [6]
 One witness' testimony went only to the question of damages. The testimony of Sister Una McCormack, a Bureau executive administrator, and of Dr. Lewis, the psychologist who interviewed Anna in January 1975, added little to the case records and reports that had been introduced at the first trial. Dr. Lewis referred often to her reports during the course of her testimony and Sister Una had little independent recollection of the January 1975 events. Sister Una had no active involvement in the case again until August 1977 when Mrs. Senerchia made her disclosure to the Bureau. Ms. Dellaverson, the caseworker from the summer of 1975 until May 1977, also testified. Her case records were in evidence at the first trial, and her testimony was arguably new primarily in her assertion that she had visited the foster home every three weeks during this period, a fact at variance with her case records. This contradicted testimony cannot justify taking the question from the jury
 
 
 [7]
 The Bureau contends that the previous panel clearly erred in finding certain jury instructions misleading and in requiring other instructions. We disagree for the reasons set forth in the earlier opinion. See Doe I, 649 F.2d at 141-47
 
 
 [8]
 The Bureau's further contention that the decision in Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), has changed the controlling law has no merit. Parratt involved a state prisoner's section 1983 suit for negligent loss of a hobby kit. Unlike this case, only mere negligence was asserted, and the deprivation complained of was a property loss
 
 
 [9]
 "Mere doubt" of such a change is insufficient to open a matter for full reconsideration. See Fogel v. Chestnutt, 668 F.2d 100, 109 (2d Cir.1981), cert. denied, --- U.S. ----, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982); Zdanok v. Glidden Co., 327 F.2d 944, 952 (2d Cir.), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964)
 
 
 [10]
 See N.Y.Soc.Serv.Law Sec. 413 (McKinney Supp.1982). We also noted that a March 1975 memorandum of Assistant Commissioner Parry interpreting this requirement and reminding agencies of this duty stressed that any error should be on the side of reporting. Doe I, 649 F.2d at 147 n. 13, 147-48
 
 
 [11]
 We also noted that New York law defines keeping a child out of school as child abuse. See Doe I, 649 F.2d at 146 n. 12
 
 
 [12]
 The trial judge's characterization of Dr. de Alvarado's opinion as a "guess" is unwarranted since Dr. de Alvarado used accepted clinical methods, i.e. observation of reactions and familiarization with case history. Although the trial court construed the record as showing that the Bureau found Dr. de Alvarado's opinion to be unjustified, from the facts presented to it, the jury could have concluded that Bureau personnel should have evaluated Dr. de Alvarado's suspicion in light of her extensive psychiatric clinical experience over a twenty year period, as distinguished from that of Dr. Lewis, the agency psychologist, who had received her doctoral degree in January 1975, the same month she interviewed Anna and Mr. Senerchia