**WENDY H., a minor, By and Through her next friend, Anna SMITH**

v.

**CITY OF PHILADELPHIA, Philadelphia Department of Human Services, Joyce Finney, Women's Christian Alliance and Curtis Bogans.**

**Civ. A. No. 92–450.**

United States District Court, E.D. Pennsylvania.

March 24, 1994.

John R. Padova, Jr., Nicholas J. Lisi, Guy Vilim, Gold & Vilim, M. Robin Maddox, Philadelphia, PA, for plaintiff.

Jeffrey M. Scott, Asst. City Sol., Gerald B. Ingram, Philadelphia, PA, for defendant.

### MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

In the context of a motion for summary judgment, I must determine the standard of care owed to a child in foster care by a city worker responsible for supervising the

foster home placement and welfare of the child, and the parameters of that responsibility when the city has delegated primary supervision to another agency. Next, I must determine whether evidence that a city worker failed to closely monitor a child in foster care after having been put on notice of previous sexual abuse, and neglected certain duties which might have revealed other factors placing the child at high risk for future abuse constituted a violation of that standard of care.

■ I find that the city worker's duty of care requires that she substantially comply with minimum standards of "professional judgment." I also find that the plaintiff has introduced sufficient evidence that the defendant worker's conduct violated that standard to create a material issue of fact for the jury.

### I. Facts

The following facts are either undisputed by the plaintiff and the moving defendants—the City of Philadelphia, DHS, and Joyce Finney—or must be treated as true in order to decide the motion for summary judgment. The plaintiff Wendy H. was born on August 2, 1980. After several years, her parents left her and her older brother Alonzo H. in the care of her grandfather. Deposition of Joyce Finney at 22. In June or July of 1987, the City of Philadelphia, acting through its Department of Human Services (DHS) took protective legal custody over both children and placed them in foster care. Finney at 88. In September of 1987, both children were removed from their initial placement and placed in the home of Elizabeth and William Mitchell. Plaintiff's Exhibit 1.

The City carried out the foster care arrangements of Wendy and Alonzo H. by relinquishing them to the physical custody of the Women's Christian Alliance (WCA) which then made the placement into the foster home. Finney at 10. The City maintained legal custody over the children. *Id.* The City compensated WCA for providing foster care services, and WCA in turn compensated foster parents such as the Mitchells for providing foster homes. Defendants' Exhibit B. The City maintained the responsibility under state statute for "the care, protection, train-

ing and education, and the physical, mental, and moral welfare of the child." 42 Pa.Cons. Stat.Ann. § 6357.

Hattie Reeves was the DHS worker originally assigned to supervise and monitor the placement of Wendy H. Finney at 8, 11. In August of 1988, about a year after the plaintiff had been placed in the Mitchell's home, Defendant Joyce Finney replaced Reeves as the DHS worker assigned to Wendy H's case. Finney at 8. Finney has been a DHS social worker since November, 1986. Finney at 13.

The plaintiff's file provided to Finney by Reeves when Finney took over the case included a case summary and an ongoing social work narrative of the plaintiff's foster placement. Defendants' Exhibit F. Finney read the one page summary, but did not read the social work narrative. Finney at 19, 28.

The one page report indicated that the plaintiff had been sexually abused in the past. Finney at 40. The social work narrative, which Finney did not read, included a July 27, 1988 log entry which indicated that the plaintiff had been sexually abused by her brother Alonzo H. previous to the time when the two were placed together in foster homes. Defendants' Exhibit F.

DHS provides a manual to its workers entitled *Protective Services Investigation Decisions Handbook*. Plaintiff's Exhibit C. That manual contains a risk assessment tool that identifies, "factors which experience has shown to be associated with child abuse/neglect risk and severity." Exhibit C. at 3–20. The manual identifies the following factors as creating a high risk of future abuse: when there is a history of previous sexual abuse suffered by the victim; when the original perpetrator is under sixteen years of age the victim is at high risk to be abused by the same perpetrator again; and when a previous abuser has constant access to the victim by living in the same home. Plaintiff's Exhibit C at 3–B.

The manual further states that

[I]n a case involving sexual abuse, the factor of "Perpetrator Access to Child" would warrant major consideration, and "Complete Access to the Child" might be suffi-

cient reason for the [social] worker to seek a protective custody arrangement for the child; or a court order removing the perpetrator from the home, even though most of the other factors may be at the low end of the risk continuum.

Exhibit D at 3–26.

The manual also required Finney to visit and speak privately with the plaintiff every six months. Finney at 107.

WCA assigned a social worker, Curtis Bogans, to the plaintiff. Finney at 34. Pursuant to state law, Bogans was required to make a home visit to the plaintiff's home once a month. Bogans II at 91. Bogans and the WCA sent Finney and DHS Quarterly Reports and Individual Service Plans for the plaintiff. Defendants' Exhibit I and J. Finney acknowledges not having read many of the reports sent by Bogans. Finney at 65. She also acknowledges her failure to participate, as required by the DHS Operations Manual, in bi-annual Individual Service Plan meetings; she attended only one during the time she handled the plaintiff's case. Finney at 65–66.

From the time Finney took over the plaintiff's placement in August of 1988 until June of 1990 when plaintiff was removed from the Mitchell's home and placed with an aunt, Finney visited with the plaintiff three times, on September 21, 1988, on August 11, 1989, and on May 25, 1990. Finney at 43, 67.

In late 1988, the Mitchell's teenage son Dana began sexually abusing the plaintiff. Deposition of abuse investigator Emory Ellis at 32, 39, 43. The abuse included both vaginal and anal rape and continued throughout the almost two more years in which the plaintiff lived in the Mitchell's home. *Id.* In August of 1989, the plaintiff reported the abuse to Mrs. Mitchell and Bogans. Finney at 94, 97. Neither took action. Bogans did not inform Finney or anyone else at DHS about the plaintiff's reports of sexual abuse. Bogans II at 82. At some point, Alonzo H., the plaintiff's brother, participated in the sexual abuse. Ellis at 36, 45.

When Finney made her visit to the Mitchells on August 11, 1989, both the plaintiff and her brother reported being hit by Mrs. Mitchell. Finney reported these complaints to Bogans and shortly thereafter asked him to investigate. Bogans I at 118. Finney asserts that such complaints were never made by Wendy H., Finney at 53, 56; however, her account is contradicted by Bogans' testimony regarding Finney's call urging investigation of the complaints. Bogans I at 118. According to Bogans, Mrs. Mitchell acknowledged striking the plaintiff on only one occasion. Bogans I at 126–27. Bogans eventually determined that the claims of abuse were false. Bogans II at 13. No further action was taken by Bogans or Finney on this issue.

During the period when the plaintiff was being sexually abused, she began to manifest behavior problems. Bogans I at 71. Bogans specifically recorded an incident in which the plaintiff destroyed audio tapes belonging to Mr. Mitchell. *Id.* Bogans reported this behavior to Finney. Bogans I at 92; Bogans II at 26.

The behavior problems motivated Bogans to have the plaintiff evaluated by a psychiatrist, a fact of which Finney was aware. Bogans II at 92. The evaluation, which was completed in February, 1989, recommended out-patient therapy. Plaintiff's Exhibit E. Neither Bogans nor Finney ever obtained a copy of the evaluation, and the plaintiff never entered therapy. Bogans I at 80–83.; Finney at 80.

The plaintiff's behavior problems continued throughout 1989. Bogans I at 94, 105. Bogans described her as "anti-authority" and violent towards smaller children. Bogans I at 94, 97–98. She behaved poorly in school, resulting in three suspensions. Bogans I at 105. The school problems were reported to Finney. Bogans I at 114–15. Finney in her deposition asserted that she did not know of the plaintiff's problems in school or other behavior problems which appear in Bogans' reports. However, in a report which she submitted to the state court in November, 1989, she stated that Wendy had been having behavior problems in school. Plaintiff's Exhibit F.

In February of 1990, the plaintiff's aunt, Geraldine Jackson, expressed interest in having the plaintiff and Alonzo come live with

her on a permanent basis. Finney Deposition. For several months, the children made bi-weekly visits to Jackson's home, and in June, 1990, they moved into her home on a permanent basis. *Id.*

On July 9, 1990, Jackson contacted Finney to inform her of the plaintiff's complaints of sexual abuse. Finney at 90. Jackson also told Finney that the plaintiff had complained to Mrs. Mitchell and Bogans. *Id.* at 94. Finney called Bogans, who acknowledged the plaintiff's complaints, but expressed his belief that the plaintiff's allegations were false. *Id.* at 97–99.

Finney immediately visited Jackson's home and spoke to the plaintiff. Finney Deposition. The plaintiff reiterated her complaints of sexual abuse. *Id.* Both Dana and Alonzo have since admitted to the attacks. Ellis at 39, 43; Finney at 103–04.

## II. Discussion

### A. *Procedural Posture and Summary Judgment Standard*

Plaintiff filed suit under the Fourteenth Amendment, the Federal Adoption Assistance Act and state statutes against the City of Philadelphia, the Department of Human Services (DHS), Finney, the Women's Christian Alliance, Curtis Bogans, and Elizabeth Mitchell.[1] Defendants City of Philadelphia, the DHS, and Finney have moved for summary judgment. Finney has moved on the basis that any misconduct on her part did not rise to the level of a constitutional violation. The City and DHS ground their motion for summary judgment in the plaintiff's failure to proffer evidence that any violations against the plaintiff were the result of a "policy or practice" on the part of the city or the agency, and the failure to identify the relevant policymaker for such a policy or practice.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Defendants are entitled to summary judgment only if no reasonable resolution of the conflicting evidence and the inferences which could be drawn from that evidence could result in a judgment for the plaintiff. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Where there is a dispute or disagreement over what inferences reasonably could be drawn from the facts, even if those facts are undisputed, it is improper to grant summary judgment. *See Nathanson v. Medical College of Pennsylvania*, 926 F.2d 1368, 1380 (3d Cir.1991). However, "the mere existence of a scintilla of evidence in support of plaintiffs['] position will be insufficient[;] there must be evidence on which the jury could reasonably find for the plaintiff[s]." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

### B. *Liability of Individual Defendant Finney Under 42 U.S.C. § 1983*

To make out a claim under civil rights statute 42 U.S.C. § 1983, plaintiff must allege the violation of a constitutional or federal statutory right. Defendant Finney concedes a substantive due process right to reasonable safety for foster children. Defendants' Motion for Summary Judgment at 25. Courts have recognized this right as implicit in the "special relationship" created by the state when they take children from their natural parents and place them in foster homes, a right analogous to the relationships created between the state and individuals when the individual is committed to a mental institution or incarcerated. *See e.g. Baby Neal v. Casey*, 821 F.Supp. 320, 335 (E.D.Pa. 1993); *K.H. v. Morgan*, 914 F.2d 846 (7th Cir.1990); *Taylor ex. rel. Walker v. Ledbetter*, 818 F.2d 791 (11th Cir.1987) cert. denied, 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989) (*en banc*); *Doe v. New York City Dept. of Social Services*, 649 F.2d 134 (2d Cir.1983).

The parties disagree, however, on whether the standard of care owed the plaintiff by

---

1. The Mitchells were named as defendants in plaintiff's complaint. However, plaintiff has now dropped its claims against the family. Plaintiff's

Response to Defendants' Motion for Summary Judgment, page 1, note 3.

Finney is the "deliberate indifference" standard established for care of prisoners, *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), or the "professional judgment" standard extended to care in mental institutions. *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Shaw v. Strackhouse,* 920 F.2d 1135 (3d Cir. 1990). The circuits have divided over the proper standard. *See e.g. Yvonne L. by and through Lewis v. New Mexico Dept. of Human Services,* 959 F.2d 883, 893–94 (10th Cir.1992) (professional judgment standard); *K.H.,* 914 F.2d at 854 (7th Cir.) (professional judgment); *Taylor,* 818 F.2d at 797 (11th Cir.) (deliberate indifference); *Doe,* 649 F.2d at 141 (2d Cir.) (deliberate indifference).

In *Youngberg v. Romeo,* the Supreme Court's choice of the arguably more strict "professional judgment" standard for the state's care in mental institutions, rather than the more permissive "deliberate indifference" standard was grounded in the recognition that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." 457 U.S. at 321–22, 102 S.Ct. at 2461–62. As others, including a member of my own court, have recognized, this consideration is equally prevailing in the assignment of children to foster homes. *Cf. Yvonne L.,* 959 F.2d at 894; *Baby Neal,* 821 F.Supp. at 340 (professional judgment standard is correct because "similar[ly] to institutionalized mental patients, [foster] children have been placed in the custody of the state through no fault of their own"); *LaShawn A. v. Dixon,* 762 F.Supp. 959, 996 (D.D.C.1991), aff'd 990 F.2d 1319 (D.C.Cir.1993). I find that the "professional judgment" standard is appropriate for evaluating defendant Finney's conduct.

If "deliberate indifference" is equated with recklessness or gross negligence, *Doe,* 649 F.2d at 143, and failing the "professional judgment" standard demands more misconduct than simple negligence, *Youngberg,* 457 U.S. at 321–22, 102 S.Ct. at 2461–62, then at first blush it seems we dance on the head of a pin in applying the professional judgment standard. *Cf. Shaw,* 920 F.2d at 1146. But

the "professional judgment" standard represents more than just a difference in degree of malfeasance, but in kind.

■ In *Youngberg,* in which the professional judgment standard was first employed by the United States Supreme Court, the Court established that a decision

if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462. The Court designated professional standards as the baseline from which defendants' conduct should be measured, rather than the conduct of a "reasonable man" which grounds determinations of negligence, gross negligence, and recklessness. By transforming the relevant comparison, the Court implicitly enhanced the importance of expert testimony; indeed, in all but the most clear cut circumstances such testimony on the exercise of professional judgment is probably necessary. *Cf. Youngberg,* 457 U.S. at 323, n. 31, 102 S.Ct. at 2462, n. 31; *Society for Good Will to Retarded Children, Inc. v. Cuomo,* 902 F.2d 1085, 1089–90 (2d Cir.1990). Furthermore, the professional judgment standard is more exacting than just professional malpractice; liability should attach only when the defendant failed to meet "professionally accepted minimum standards." *Society for Good Will,* 902 F.2d at 1090 ("Expert reports and testimony should be used only to establish the general parameters of acceptable, constitutional activity, and not whether the exercised professional judgment was indisputably correct and unassailable—or for that matter even a better approach to the problem.")

Defendant Finney's principal assertion behind her motion for summary judgment is that under either the "deliberate indifference" or "professional judgment" standards she must have done more than neglect duties; she must have either "known or suspected" that the conditions in the foster home were dangerous. Defendants Motion

for Summary Judgment at 30. The implicit contention of this argument is that liability could have attached only if she had failed to act after being made aware by the plaintiff or Bogans of the sexual abuse occurring in the Mitchell home. I find that this assertion misstates the professional judgment standard, and the obligation Finney had to the plaintiff even after the primary social work role was delegated to the WCA and Bogans.

First, I must note that Finney mischaracterizes her own conduct when she contends that she was not at all on notice to the risk to the plaintiff; the case summary which she did read informed her that the plaintiff had previously been a victim of sexual abuse. However, because the allegation that Finney failed to exercise professional judgment is supported by evidence that includes numerous instances where Finney's neglect of her duties blinded her to the risks the plaintiff faced, I will address her contention that such misconduct cannot be held against her.

While the Supreme Court did not fully delineate the professional judgment standard in its *Youngberg* decision, it acknowledged that it was adopting the framework employed by then Chief Judge Seitz in his opinion concurring in the *en banc* Third Circuit panel's holding in the same case. *Youngberg*, 457 U.S. at 321–22, 102 S.Ct. at 2461–62 (citing to *Youngberg v. Romeo*, 644 F.2d 147, 178 (3d Cir.1981) (*en banc*) (Seitz, C.J. concurring)).

Judge Seitz's concurrence differentiated what he believed to be the correct standard for a constitutional tort from the majority's insufficiently deferential "reasonableness" or "malpractice" standard. *Id.* at 177–78. Instead he insisted, and the Supreme Court subsequently agreed, that "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Id.* at 178.

To fulfill this requirement in the context of an institution, Judge Seitz stated and reiterated that the defendants "have an *affirmative obligation to discover the needs of* ... patients, and to respond to those needs in an adequate manner." *Id.* at 177, 178 (emphasis added). This delineation of the professional judgment standard suggests that defendants evaluated under it are constitutionally required not just to respond to danger to safety which they have been put on notice to, but to act in a manner which avails them of that notice. *Cf.* Susan Stefan, *Leaving Civil Rights to the "Experts": From Deference to Abdication Under the Professional Judgment Standard*, 102 YALE L.J. 639, 707–08 (1992).

Courts analyzing constitutional claims in the foster child context have found violations by defendants for harm caused by their neglect, absent actual knowledge of the risk. *See e.g. Lashawn A. v. Dixon*, 762 F.Supp. 959, 993, 996, 997–98 (D.D.C.1991) ("To the extent that certain services, such as appropriate placements and case planning, are essential to preventing harm to the children in the District's custody, this Court holds that the children have a constitutional liberty interest in those services.")

The Second Circuit found such neglect actionable even under the less rigorous deliberate indifference standard. *See Doe*, 649 F.2d at 142, 143 ("repeated acts of negligence could be evidence of indifference") ("the fact that there can be instances where glaring negligence may not constitute deliberate indifference does not mean that a fact finder is barred from equating negligence of a certain dimension with deliberate indifference.") The Second Circuit distinguished the key question as being "whether the state of mind was such that the agency may be 'meaningfully' termed, 'culpable'." *Id.* at 144. The Court insisted that while deliberate indifference

> cannot exist absent some knowledge triggering an affirmative duty to act on plaintiff's behalf, ... *actual knowledge of a specific harm is not the only type of knowledge that will suffice*. Defendants may be held liable under § 1983 if they ... *exhibited deliberate indifference to* a known injury, a known risk, or *a specific duty*, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution.

*Id.* at 145 (emphasis added); *see also id.* at 145 (the above analysis should not be looked upon as imposing strict liability, "but as inferring deliberate unconcern for plaintiffs' welfare from a pattern of omissions revealing deliberate inattention to specific duties imposed for the purpose of safeguarding plaintiffs from abuse.").

Defendant Finney cites in opposition to this understanding *Shaw v. Strackhouse,* 920 F.2d 1135 (3d Cir.1990), in which a retarded resident of a mental institution brought a § 1983 action for two incidents of sexual abuse. The Circuit Court found several of the named defendants liable for the second incident when they were on notice of the threat to the plaintiff, but not for the first event. *Id.* at 1144, 1149.

While this holding does not stand in contradiction to the defendant's contention that failure to exercise professional judgment can occur only when a defendant is on actual notice to harm or risk of harm, it also does not confirm it. Defendant Finney cites *Shaw* for the quoted statement that to be liable professionals "knew or suspected" dangerous conditions, but neither that phrase nor one similar to it appears in the text of that decision. In fact, in addressing the initial event of sexual abuse, the Court points out that in regards to the suspected abuser "[w]e find nothing in the record indicating that defendants either knew or *should have known* of the risk posed by [him.]" *Id.* at 1144 (emphasis added). Accordingly, any failures in the level of supervision of the plaintiff constituted no more than simple negligence. *Id.* at 1143. However, the court was not faced with evidence that the defen-

dants would have known of a risk to the plaintiff had they not neglected an important duty. *Id.*

While the Third Circuit has not directly dealt with the issue in the foster care setting, I am persuaded by the holdings of the *LaShawn A.* and *Doe* courts that plaintiffs in making out a claim of constitutional violation can employ evidence of misconduct which is not predicated on actual knowledge of harm or risk. To do otherwise would be to endorse neglect by government officials in the care of institutionalized and foster children. Indeed, to allow officials entrusted with these responsibilities to neglect their duties with impunity would stand the professional judgment standard on its head by placing the officials in a better position if they could claim "I didn't read the report" or "I didn't return phone calls", than if they explained that "I read the report and kept in contact with my charges, and I made this decision because ...".[2]

Such failure to exercise professional judgment is particularly egregious in the case of children, for whom the state has taken responsibility in the stead of the caretakers in which our society has traditionally vested its greatest trust—the children's families. The fact that the state has delegated much of the plaintiff's care and supervision to two layers of private actors—the foster family, and the social work agency—makes the duties the state has maintained even more vital. If we fail to insist that the state appropriately supervise and monitor placements, children like Wendy H. may lose an opportunity to extricate themselves from victimization, and are

---

**2.** My interpretation of the *Youngberg* professional judgment standard is in opposition to the majority's holding, and in accord with Judge Coffey's dissent, in the 7th Circuit's application of the standard to foster care circumstances in *K.H. Through Murphy v. Morgan,* 914 F.2d 846 (1990). The majority, confronted with the circumstance of a child who had been abused by foster parents, limited liability under the professional judgment standard to officials who handed the children over to a foster parent *"whom the state knows or suspects to be a child abuser."* *Id.* at 852 (emphasis in the original).

Judge Coffey asserted in dissent that by this statement "[t]he majority strains the law and

intentionally limits the scope of protection to which a child in state custody is entitled." *Id.* at 861. He cited *Youngberg* and *Doe,* 709 F.2d 782 (2d Cir.1983), for the proposition that a pattern of neglect of obligations could occasion liability. *Id.* His admonishment that "[i]t is not too much to ask that the state honor its obligation to monitor the current *status and needs of the children dependent upon its care mandated within the parameters of its own regulations,"* *id.* (emphasis in original), is equally powerful in the case before me. I find Judge Coffey's analysis and the weight of circuit authority to be in accord with my interpretation of *Youngberg's* mandate, and therefore I do not find the holding in *K.H.* to be persuasive authority.

left to suffer harms which may never be undone.

■ Furthermore, allowing evidence of misconduct by officials which did not give them actual knowledge of harm or risk, but instead allowed them to avoid such knowledge, to impact on liability does not place officials at excessive risk of liability. Constitutional liability will not attach for every error in judgment nor for every mishap which occurs on the defendants watch, but only when the professional's misconduct was a "substantial departure" from acceptable practice. *Youngberg*, 644 F.2d at 178. Liability is further cabined by the plaintiff's obligation to show that the neglect of duty proximately caused the liberty violation. *Doe*, 649 F.2d at 145. Additionally, as the Second Circuit observed "[t]here is a closer and firmer line of authority running from superiors and subordinates within an institution than exists in the foster care context ... [which] suggest[s] that [a constitutional violation] ought not to be inferred from a failure to act as readily as might be done in the prison context." *Id.* at 142. Accordingly, in requiring "professional judgment" of defendant Finney, I do not expect constant supervision, but rather responsible placement in, and oversight of, the foster home.

Both parties submitted expert reports illuminating the issue of whether Finney employed "professional judgment" in her supervision of Wendy H's placement. The plaintiff's expert, Paul H. Glasser, Ph.D., former dean and current professor at the School of Social Work at Rutgers University in New Jersey, submitted an expert report asserting that Finney failed to exercise professional judgment based on the following observations: Finney's failure to read the case narrative which identified Alonzo H. as a previous sexual abuser left her unable to assess the propriety of placing the siblings in the same home, and deprived Bogans of that information so that he might have supervised the situation more closely; Finney's failure to visit the plaintiff every six months; her failure to adequately monitor the plaintiff's behavior and performance in school; Finney's failure to have monthly contact with Bogans and to read the quarterly reports

provided by him; Finney's failure to read and evaluate the psychiatric evaluation of the plaintiff; and Finney's failure to participate in ISP conferences. Plaintiff's Exhibit J. While acknowledging the difficult workload Finney was saddled with, he concluded specifically that

> [I]n the case of Wendy H. the DHS worker's failure cannot be excused. When Ms. Finney read the Transfer Summary and learned that Wendy H. had been sexually abused she should have been alerted immediately to the great possibility that this was a high risk case. I can think of no professional judgment she could make to justify her failure to check out the circumstances surrounding such abuse, a description of which was available in Ms. Reeves' case record, so that she would learn that Alonzo, Wendy H's brother, was one of the abusers. This should have been communicated to Mr. Bogans, the WCA worker, so that he could be alert to potential difficulties. Further, Ms. Finney herself should have followed this case more closely than many others because of the sexual abuse that occurred between siblings residing in the same foster home.

*Id.* Finney herself acknowledged the case narrative as an important source of information for social workers in her position. Finney at 17, 28.

Plaintiff's expert labeled the set of requirements unfulfilled by Finney as "rather lenient." Exhibit J. In the case of the home visits, Dr. Glasser asserts that when sexual abuse is indicated in a report, the social worker should make more frequent visits than the required every six months. *Id.* Finney visited approximately every ten months.

Dr. Glasser also noted that Finney inadequately responded to the children's complaint of physical abuse by failing to independently investigate the complaint, and failing to visit the home again until nine months after the complaints. Exhibit J. Finney denies that the plaintiff made such a complaint. However, the plaintiff has introduced evidence in the form of Bogans' deposition testimony which contradicts her assertion and must be accepted as true for the purpose of deciding

a summary judgment motion. Accepting Finney's knowledge of the physical abuse complaint as true, her failure to make individual contact with the plaintiff or more closely supervise the investigation of the abuse charge provides another example of inadequate oversight; furthermore, in the eyes of the plaintiff it may have closed an avenue through which she could have disclosed the sexual abuse she suffered.

Defendants' expert report in no way contradicts the plaintiff's expert to a degree sufficient to remove material issues of fact on the issue of professional judgment. Much of the report is given over to an explanation of Finney's role as case management rather than hands-on social work. Expert Report of Constance Mercer Meyers. I believe that plaintiff's expert took this as a given in evaluating Finney's conduct, as do I; clearly if Finney was expected to maintain the contact and vigilance over the plaintiff's placement that a hands-on social worker should, there could be no tenable contention at all that she was not liable. But Finney cannot be excused from liability simply because Bogans, the hands-on social worker, inadequately filled his role; "[m]erely because the state contracts out this work, it is not relieved of its duty to exercise the proper care or supervision of the child under the due process clause." *K.H.*, 914 F.2d at 860, n. 6 (Coffey, J. concurring in part and dissenting in part); *see also K.H.*, 914 F.2d at 851–52 ("It should have been obvious from the day *Youngberg* was decided that a state could not avoid the responsibilities which that decision had placed on it merely by delegating custodial responsibilities to irresponsible private persons").

The defendants' expert also highlights the fact that Finney had no way of knowing that the plaintiff was at risk. Report of Mercer Meyers. As I have stated above, that lack of knowledge is due in part to Finney's acknowledged neglect of her duties. Nor does the expert report address the piece of information Finney did have—that plaintiff had previously been the victim of sexual abuse. The expert in fact suggests that Wendy's case was properly "back-burnered" because "[p]riority [is] assigned to cases with known

risk factors." Report of Mercer Meyers. That evaluation ignores Finney's failure to respond to one risk factor labeled by the DHS' own manual—previous victimization—which Finney was aware of, and her ignorance of two other DHS designated risk factors—previous abuser is under sixteen, and previous abuser has continued constant access to the victim—because she had neglected to read the case narrative. The implicit suggestion of this report is that had Finney responded to all the information that as a professional social worker she should have been aware of, Wendy H's placement would have properly sat squarely on the "front burner" of her caseload.

■ Plaintiff's expert report also provides sufficient evidence to go to the jury on the issue of whether Finney's failure to exercise professional judgment caused the constitutional violations against the plaintiff. At the very least, Finney's neglect exposed the plaintiff to the high risk of a repeat of sexual abuse from her brother, an event which did occur. Furthermore, the expert report and DHS' manual both indicate that as a previous victim, the plaintiff was at high risk for future abuse by other actors as well. That risk might have been minimized by more vigilant monitoring by Finney, and by greater admonitions on her part to Bogans to be aware of the possibility of abuse.

*C. Liability of the City of Philadelphia and the Department of Human Services under 42 U.S.C. § 1983*

■ The plaintiff sued Defendant City of Philadelphia for carrying out a custom, practice or policy of inadequate review of its social workers reports, a neglect leading to the substantive due process violations also alleged against Defendant Finney. The City moves for summary judgment based on plaintiff's failure to prove that such a custom, practice or policy existed.

In *Simmons v. City of Philadelphia,* 947 F.2d 1042 (1991), the Third Circuit made clear that "absent the conscious decision or deliberate indifference of some natural person, a municipality, as an abstract entity, cannot be deemed in violation by virtue of a policy, a custom, or a failure to train." *Id.* at

1063. This decision included an acknowledgment of the Supreme Court's holdings that "it should not be left to juries to decide which officials' decisions should subject a municipality to section 1983 liability." *Id.* at 1062 (citing *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) and *Jett v. Dallas Independent School District,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)). Accordingly, a plaintiff's allegations "must both identify officials with ultimate policymaking authority in the area in question and adduce scienter-like evidence ... with respect to them." *Simmons,* 947 F.2d at 1062.

Neither the plaintiff's complaint, nor its response to the summary judgment motion identifies any person or group of persons or even official office which is responsible for the allegedly offending policy. The plaintiff's response to the summary judgment motion in no way even engages the defendants' argument that such identification is necessary. Accordingly, summary judgment is granted in regards to the defendant City of Philadelphia's liability under 42 U.S.C. § 1983.

### D.  Other Claims

Plaintiff brought claims under the Federal Adoption Assistance Act, but now drops those claims in light of *Suter v. Artist M.,* —— U.S. ——, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). *See* Plaintiff's Response to Summary Judgment Motion at 25.

■ The plaintiff also brought state law claims against the City, DHS, and Finney. The defendants' summary judgment motion raised only 42 Pa.C.S.A. § 8541 as grounds for dismissing those claims. That statute provides that

> no local agency shall be liable for any damages on account of any injury to a person or property caused by an act of the local agency or an employee thereof or any other person.

The statute by its terms does not protect Finney from liability, and accordingly, the state law claims against her remain viable. The statute does immunize the city and its agencies. *See J.F. v. County of Erie,* 6 D & C 4th 146, 148 (1990).

AND THEREFORE, this 24th day of March, 1994, IT IS ORDERED that:

1. Summary Judgment is GRANTED to the defendants City of Philadelphia and the Department of Human Services on all counts.

2. Summary Judgment is GRANTED to defendant Joyce Finney on the count brought under the Federal Adoption Assistance Act.

3. Summary Judgment is DENIED to defendant Joyce Finney on the counts brought under 42 U.S.C. § 1983 and under state statutes.