**ANDREA L., by her next friend, JUDITH B., Plaintiffs,**

v.

**CHILDREN AND YOUTH SERVICES OF LAWRENCE COUNTY; Lawrence County, Pennsylvania; Community Alternatives, Inc.; Frank Merlino; and Tammi Baxter, Defendants.**

No. CIV.A. 96–2035.

United States District Court, W.D. Pennsylvania.

Sept. 30, 1997.

Michael L. Rosenfield, Pittsburgh, PA, Joseph J. Kearney, New Castle, PA, for Plaintiffs.

James J. O'Connell, Joanne D. Nene, New Castle, PA, Alan S. Baum, Gasca, Matis & Baum, Suzanne B. Merrick, Gaitens, Tucceri & Nicholas, Richard D. Klaber, Dickie, McCamey & Chilcote, Pittsburgh, PA, for Defendants.

## MEMORANDUM OPINION

CINDRICH, District Judge.

Plaintiff ("Andrea") is a minor who became pregnant while placed in a foster home. The father is a natural son of the foster parents, also a minor at the time of the relevant events. In this action Andrea makes claims involving violations of her right to liberty and substantive due process of law, violations of Pennsylvania child welfare law, and common law negligence. Defendants Community Alternatives, Inc. ("CAI"), and Tammi Baxter have moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, we will grant the motion in part and deny it in part.

## I. FACTS

We take the facts from the Complaint. Andrea was born in July 1981. On September 14, 1995, Andrea's mother, referred to as Mrs. B. in the Complaint, reported her missing. The State Police found Andrea the same night and took her to Children and Youth Services of Lawrence County ("CYS"). Defendant Merlino was the CYS caseworker assigned to Andrea's case. CYS has a contract with CAI, a non-profit corporation, for CAI to assist CYS with foster care placements and related social services. Defendant Baxter was the CAI social worker assigned to Andrea's case.

On September 16, 1995, CAI placed Andrea with a foster family, the Moyers. At the time, the Moyers had three boys living with them, ages 16, 14, and 12. In a letter dated September 25, 1995, Mrs. B. wrote the CYS director that Andrea was sexually active, and stated that she required close supervision. On November 8, 1995, Andrea was given a psychological test that revealed "an extremely strong libido." Compl. ¶ 32. In March 1996, Ms. Moyer notified Baxter that Andrea and the Moyers' 17 year old son Ricky may have become sexual partners. Baxter met with Andrea and Ricky Moyer and "told them not to get caught, to lie low and to be discreet." Compl. ¶ 35. In June 1996, it was discovered that Andrea was pregnant, and that Ricky Moyer was the father. In July 1996, CYS asked the court of common pleas to approve a transfer of Andrea from a foster home to an institution.

Andrea filed her Complaint here in January 1997. Her claims are set forth in four counts. The federal claims are brought pursuant to 42 U.S.C. § 1983. Count One is against all defendants for violations of Andrea's rights to liberty and substantive due process as guaranteed by the Fourteenth Amendment. Count Two is against CYS and Lawrence County for maintaining policies resulting in deliberate indifference to Andrea's rights. Count Three is against all defendants for violating several Pennsylvania child welfare statutes and regulations. Count Four is against all defendants for negligence.

As stated above, CAI and Baxter have moved to dismiss Counts One and Three for

failure to state a claim. As to Count One, defendants argue that Andrea's injury does not involve a constitutionally protected right, and that they were not state actors. Andrea responds that there is a special relationship between dependents of local governments and their agencies that creates affirmative duties of insuring health and safety. Defendant failed to observe these duties, which led to a violation of her constitutional rights. We will first address the section 1983 claim under Count One, which may dispense with the need to consider the motion as to Count Three.

## II. STANDARD OF DECISION

■ In deciding a Rule 12(b)(6) motion, we accept all well pleaded facts as true and draw all inferences in favor of the non-moving party. We focus on the pleadings in addressing the motion, but we may also consider matters of public record, orders, exhibits attached to the complaint, and items appearing in the record of the case. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384–85 and n. 2 (3d Cir.1994). A claim should not be dismissed unless it appears beyond doubt that the non-moving party can prove no set of facts in support of its allegations which would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *City of Philadelphia v. Lead Industries Ass'n*, 994 F.2d 112, 118 (3d Cir.1993). Even a defective complaint will not be dismissed unless it appears to a certainty that the defect in the complaint cannot be cured by amendment. *See, e.g., Neitzke v. Williams*, 490 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

## III. DISCUSSION

"In order to establish a section 1983 claim, a plaintiff 'must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law.'" *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir.1996) (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir.1995), *cert. denied*, 516 U.S. 858, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995)). "Generally, the first issue in a § 1983 case is whether a plaintiff sufficiently alleges a deprivation of any right secured by the constitution." *D.R. v. Middle Bucks Area School*, 972 F.2d 1364, 1367 (3d Cir.1992) (en banc). We will consider the existence of a constitutional right first.

Because of the source of Andrea's constitutional claim, we must approach this task with caution. The Supreme Court

> has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.... The doctrine of judicial self restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field. It is important, therefore, to focus on the allegations in the complaint to determine how petitioner describes the constitutional right at stake and what the city allegedly did to deprive her husband of that right.

*Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261, 273 (1992) (citation omitted); *Reno v. Flores*, 507 U.S. 292, 302, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993) ("'Substantive due process' analysis must begin with a careful description of the asserted right....") (citing *Collins*).

The right Andrea seeks to vindicate is stated in alternative ways. Most broadly, she claims a substantive due process right to placement in an appropriate, safe setting. *See* Compl. ¶ 43; Plaintiff's Brief in Opposition, Doc. No. 7, at 7. She refines this description, as the factual averments of her Complaint dictate, in stating that the "defendants' outrageous conduct in failing to protect Andrea from becoming pregnant at age 14 violated her constitutional rights to liberty and substantive due process of law," Compl. at 2; "[t]he failure of the defendants to protect Andrea from getting pregnant while she was in the government's protective custody constitutes intentional disregard and/or reckless indifference for her safety and/or liberty," *id.* ¶ 48. We thus think a fair statement of the right at stake in this case is the right of a 14 year old foster child to be protected from conditions under which she might become pregnant.

A brief review of the precedent from which this alleged right might evolve will be helpful. The Supreme Court recognized prisoners' rights to adequate medical care under the Eighth Amendment in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Outside the criminal context, the Court applied this principle through the Fourteenth Amendment to mentally retarded persons involuntarily committed to state institutions in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). *Youngberg* involved repeated physical injuries, self-inflicted and inflicted by others, to a profoundly retarded man. Hence, beyond the prison or jail environment, the liberty interests of persons involuntarily confined to mental institutions are constitutionally protected by an "unquestioned duty" of the state "to provide reasonable safety for all residents and personnel within the institution." *Id.* at 324, 102 S.Ct. at 2462; *Shaw v. Strackhouse*, 920 F.2d 1135, 1142 (3d Cir.1990) ("no question that . . . the right to safe conditions of confinement—[is] encompassed within the 'liberty' substantively protected by the fourteenth amendment due process clause," citing *Youngberg* ).

The Supreme Court had occasion to review these principles in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In *DeShaney*, Wisconsin child welfare workers, after learning of a report to police of child abuse and three trips to the emergency room by the child, and making monthly home visits which revealed suspicious injuries, allowed a four-year-old boy to remain with his father. The father later beat the child brutally, sending him into a coma, and inflicting permanent severe brain damage. The Supreme Court denied that the state had a constitutional duty to protect the child because he was not in the state's custody. "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *DeShaney*, 489 U.S. at 201, 109 S.Ct. at 1006; *see also Ford v. Johnson*, 899 F.Supp. 227 (W.D.Pa.1995) (applying *DeShaney* in case of death of child at hands of natural father).

The Court in *DeShaney* included a footnote that is significant for our case.

> Had the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect. Indeed, several Courts of Appeals have held, by analogy to Estelle and Youngberg, that the State may be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents. See *Doe v. New York City Dept. Of Social Services*, 649 F.2d 134, 141–142 (2d Cir.1981), appeal after remand, 709 F.2d 782 (2d Cir.1983), cert. denied sub nom *Catholic Home Bureau v. Doe*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 . . . (1983); *Taylor ex rel. Walker v. Ledbetter*, 818 F.2d 791, 794–797 (11th Cir.1987) (en banc) . . . . We express no view on the validity of this analogy, however, as it is not before us in the present case.

*DeShaney*, 489 U.S. at 201 n. 9, 109 S.Ct. at 1006 n. 9. The court of appeals' cases cited in the footnote figure prominently in most discussions of the subject.

Andrea seeks to analogize her foster care to institutionalization that produces a "special relationship" between the person and the state, and accompanying affirmative duties on the state. Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss, Doc. No. 7, at 2. Though the Supreme Court did not decide the matter in *DeShaney*, nor has the Third Circuit, we find that foster care does produce a relationship between the child and the state that creates certain duties protected by the Due Process Clause.

First, the Supreme Court left open the door to this conclusion in *DeShaney*. Second, *Youngberg* supports this extension. "It should have been obvious from the day *Youngberg* was decided that a state could not

avoid the responsibilities which that decision [child custody] placed on it merely by delegating custodial responsibility to irresponsible private persons . . . ." *K.H. v. Morgan,* 914 F.2d 846, 851 (7th Cir.1990). Third, the language the Court and the Third Circuit[1] have used to describe the special relationship in other cases leaves enough room for this interpretation. *See, e.g., Collins,* 503 U.S. at 127, 112 S.Ct. at 1070, 117 L.Ed.2d at 275 ("The 'process' that the Constitution guarantees in connection with *any deprivation of liberty* thus includes a continuing obligation to satisfy certain minimal custodial standards.") (emphasis added); *Winston v. Children and Youth Services of Delaware County,* 948 F.2d 1380, 1390 (3d Cir.1991) ("we can consider children in foster care as analogous to the institutionalized mental patients at issue in *Youngberg v. Romeo* . . .," also citing *Doe* and *Taylor* ); *Mark,* 51 F.3d at 1150 ("There is a special relationship only in those limited circumstances where the plaintiff is *essentially in the defendant's custody.*") (emphasis added); *Shaw,* 920 F.2d at 1144 ("The requisite physical custody *may arise in a variety of forms,* including involuntary mental commitment and (criminal) incarceration.") (emphasis added).

Fourth, other courts, as noted above, have permitted actions under substantive due process for government failure to supervise foster care that resulted in injuries to the foster children. *Taylor,* 818 F.2d at 792; *Doe,* 649 F.2d 134. *K.H. v. Morgan,* 914 F.2d 846 (7th Cir.1990), makes particularly forceful conclusions in this area. In *Lewis v. Neal,* 905 F.Supp. 228 (E.D.Pa.1995), the Eastern District expressly found that foster care created a special relationship that gave rise to potential liability for the death of a young child who was beaten by a relative of the foster parent. In addition, a case with superficial similarities to Andrea's not cited by the parties is *Wendy H. v. Philadelphia,* 849 F.Supp. 367 (E.D.Pa.1994), in which the plaintiff was a foster child sexually abused by

both her natural brother and her foster brother.

Fifth, there is a firm logical foundation for extending the special relationship analysis to foster care. While the environment may be demonstrably less confining than institutionalization, the foster child is monitored and supervised by state agents, even if from a distance. Child welfare officials may be parties to life-influencing decisions of the foster child involving school, activities, relations with foster parents, behavioral limits, and the like. State officials also have the power to change the conditions of the child's placement, by moving her to other families or to institutions. The foster child does not have the freedoms from state involvement that a non-foster child has, which freedoms are protected by the same Due Process Clause, in the latter instance operating in defense of family unity. *See, e.g., DeShaney,* 489 U.S. at 203, 109 S.Ct. at 1007; *Croft v. Westmoreland County Children and Youth Services,* 103 F.3d 1123, 1125 (3d Cir.1997). We thus accept that foster status constitutionally entitles a child to certain protections that the state must insure.

■ Our next task is to identify what Andrea is entitled to have defendants protect her from. She contends that they should have prevented her from becoming pregnant, which is to say that they should have prevented her from engaging in teenage sex which could lead to pregnancy. It is well here to emphasize that nothing in Andrea's Complaint even suggests that her sexual congress with Ricky Moyer was abusive, coerced, or unwanted. Had such an averment been made, we of course would have considered it with the utmost gravity, and given the allegation of notice, that alone likely would have been sufficient grounds on which to decide a Rule 12(b)(6) motion against defendants. As it happens, considering only the relative ages of Andrea and Ricky Moyer and the facts of the Complaint, sex between the two would not have violated

---

1. In *D.R. v. Middle Bucks* the Third Circuit cited *Doe* and *Taylor* and recognized the duty they imposed on behalf of foster children, but had no need to address the foster care issue because it was not present in the case. 972 F.2d at 1372. The court did find that compulsory school attendance did not create a special relationship giving rise to section 1983 liability for injuries to students. The court also stated that it "has read *DeShaney* primarily as setting out a test of physical custody." 972 F.2d at 1370.

Pennsylvania law. 18 Pa. Cons.Stat. Ann. § 3122.1.[2] Because this case requires us to explore the contours of the federal constitutional protection of a claimed liberty interest, we are not necessarily bound by Pennsylvania's particular statutory formulation of when a lack of consent must be conclusively presumed. Nonetheless, reference to the Pennsylvania law is informative if for no other reason than that by necessary implication, all other forms of sexual congress are presumed to be consensual absent proof to the contrary. In searching for a constitutionally protected liberty interest, at least in Pennsylvania, we cannot say that the law provides any "right" to be free from otherwise consensual teenage sex. Thus, because of the somewhat limited averment of the ultimate right she invokes, we read no more into the alleged right of a 14 year old foster child to be protected against pregnancy than is literally stated.

None of the cases Andrea cited or revealed in our research involve the right of a minor foster child to be protected against teenage sex or the state of pregnancy, or any approximation of such a right. We take that as a signal, consistent with the Supreme Court's admonition in *Collins,* above, to be cautious in potentially expanding the bundle of rights guaranteed by substantive due process. Still, Andrea in her Complaint and opposition brief expresses her alleged right from a different angle, a right to appropriate placement and reasonable safety. This formulation does tap into the language of the case law but leaves open the crucial question of which protected right she claims was lost as a result of the failure to provide such appropriate placement and safety. As shown below, all the cases the parties cited or that our research uncovered involved safety in the sense of protection from physical or psychological injury.[3] Of course, the right to be free from the infliction of physical or extreme psychological harm is well accepted, but neither of those two rights seems to be directly implicated in Andrea's case.

Andrea in her opposition heavily relies on the two court of appeals' decisions cited by the Supreme Court in the *DeShaney* footnote, *Doe* and *Taylor.* In *Doe,* the court found in the record that the plaintiff from age ten was "regularly and frequently beaten and sexually abused" by her foster father, confined to her room for days, thrown down stairs, and once cut with a hunting knife. 649 F.2d at 137. *Taylor* involved a child who "suffered severe and permanent personal injuries as a result of being 'willfully struck, shaken, thrown down, beaten and otherwise severely abused by the foster mother,'" which injuries left the child in a coma from 1982 to at least the date of the decision in 1987. 818 F.2d at 792. In *K.H.,* a six year old girl had contracted gonorrhea from vaginal intercourse as a seventeen-month-old in the custody of her parents, had been transferred among nine homes by the time she was six years old, and had been beaten and sexually abused by foster parents. 914 F.2d at 848. *Wendy H.* involved sexual abuse over the course of almost two years that included vaginal and anal rape, and was perpetrated by two different boys. 849 F.Supp. at 370.

The types of injuries cited in the institution cases are almost as vile. The plaintiff in *Youngberg* suffered injuries on sixty-three occasions, though some were self-inflicted. 457 U.S. at 310, 102 S.Ct. at 2455. *Shaw* suffered two injuries strongly suggesting sexual abuse. 920 F.2d at 1140–41.

Besides the wrenching facts of the foster care and institution cases, the courts' expressions of the right to safety found therein are

---

**2.** This section provides:

> Except as provided in section 3121 (relating to rape), a person commits a felony of the second degree when that person engages in sexual intercourse with a complainant under the age of 16 years and that person is four or more years older than the complainant and the complainant and the person are not married to each other.

18 Pa. Cons.Stat. Ann. § 3122.1. Andrea was 14 at the time she became pregnant; Ricky Moyer was 17.

**3.** The right to safety includes solely psychological injury once it reaches a certain level of severity. *K.H.,* 914 F.2d at 850 ("If ... defendants must have known they were placing K.H in a sequence of foster homes that would be destructive of her mental health, the ingredients of a valid constitutional claim are present.").

phrased in terms of insulation from physical and psychological injury. For example, the court of appeals in *Taylor* squarely stated that "[t]he liberty interests in this case are the right to be free from the infliction of unnecessary pain, as that interest is protected by the fifth and fourteenth amendments, and the fundamental right to physical safety as protected by the fourteenth amendment." 818 F.2d at 794. Judge Posner in *K.H.* observed that "[t]he only right in question in this case is the right of a child in state custody not to be handed over by state officers to a foster parent ... *whom the state knows or suspects to be a child abuser.*" 914 F.2d at 846 (emphasis in original).

Andrea has cited no cases involving a state's duty to protect a foster child from voluntary sexual congress and the resultant risk of pregnancy. Thus, we are asked to equate uncoerced teenage sex and pregnancy with physical or psychological injury.

An argument can be made for just that determination. Pregnancy dramatically affects a woman's body and mind, and can have permanent, and sometimes tragic, consequences. That she is a minor child only compounds the seriousness of the consequences of pregnancy, both physically and psychologically. Physical or psychological injuries at the hands of foster parents can easily be conceived that affect less of the body and are not permanent, in the sense that they heal, and could be constitutionally actionable under the scheme described above.

But there are other elements to the right to safety not implicated in Andrea's case which we find decisive. The first is the purposeless infliction of pain. Nowhere in Andrea's Complaint or opposition brief does she suggest that the activity resulted in objectionable pain. She spoke instead of "a major disruption in her life as well as added expenses." Compl. ¶¶ 47; 51. This characterization of the results of her activity, taken as true, does not rise to the level of injury found in the case law.

Another element we find implicit in the reasonable safety analysis is force or coercion. Authorities must be especially vigilant of this factor in cases where sexual abuse of minors is suspected.[4] This surely is part of the foundation of child welfare laws and childrens' constitutional protection—minors for whom the state is responsible, lacking the practical and legal capacity to make all choices for themselves, are entitled to oversight of those into whose care they are entrusted. Such oversight should increase relative to the potential harm. *See, e.g.*, *Shaw*, 920 F.2d at 1144 ("The degree of affirmative care expected of state officials may vary with the type of physical custody involved."). Thus, if Andrea did not suffer from pain directly inflicted by a third party, was she forced into a condition that we could reliably infer produced a similar sort of injury? Locking a child in a closet, for example, may not produce immediate physical pain, but the presence of compulsion could make it wrong and actionable. As with the element of pain, however, there likewise is no mention of force or compulsion in Andrea's Complaint. And neither law nor custom commands that we treat her acts as lacking consent under the allegations of this case.

What the state actors are alleged to have done in this case—permitted a sexually active young woman to remain in close proximity with a sexually active young man after notice of the condition—may have been profoundly unwise. Indeed, most would agree that it was. However, § 1983 does not impose liability on the state for acting unwisely, but rather for failing to protect one in its custody and care from interference with a constitutional right. Unlike those cases in which the liberty interest was as fundamental and obvious as the right to be free from rape or sodomy, death or physical brutality, we can find no constitutional right of a 14 year old minor child to be protected from consensual sexual congress and risk of pregnancy.

To avoid any misinterpretation, we do not address in this opinion any policy of defendants regarding sex and pregnancy of minor foster children. The Answer of the County, CYS and Merlino is uninformative, as are most federal court answers, but implies its

---

4. There is evidence that they are. *See Croft,* 103 F.3d 1123.

discouragement of sexual activity by those in its charge. The Complaint of course paints a different picture. Regardless of the actual details, however, the court believes that the merits of government policy that discourages pregnancy among all minors are too obvious to require extended discussion. That being said, there surely are other events in a foster child's life that cause "major disruption and added expense" that do not rise to the level of a threat to her physical or psychological safety which would warrant constitutional protection.

We emphasize, however, that this decision has nothing to do with any such policy. Rather, accepting the allegations of Andrea's sexual activity and pregnancy, unaccompanied by averments of pain or coercion, and accepting defendants' knowledge, we were asked to find a right guaranteed by the Constitution to have defendants intervene to prevent this behavior directly, or as a corollary to Andrea's right to safety. We find no such right clearly expressed in the existing case law, and in the exercise of judicial self restraint decline to "break new ground in this field."

As a consequence, we need not address the issue of whether CAI and Baxter were state actors. We also need not address a state created danger theory, *Kneipp*, 95 F.3d 1199, because of our finding that no condition qualifying as dangerous has been alleged.

Regarding the remaining counts against them based on negligence and violation of Pennsylvania child welfare statutes, the motion to dismiss will be denied. As should be obvious from the preceding discussion, there is more than ample room to question the propriety of the defendants' conduct and numerous factual issues remain unresolved. Thus, dismissal of these counts would be entirely premature and the parties should be permitted to develop the factual record more fully.

An order consistent with this memorandum opinion will be entered.

### ORDER

In accordance with the accompanying memorandum opinion, Tammi Baxter's and Community Alternatives, Inc.'s Motion to Dismiss Pursuant to Rule 12(b)(6)/Motion for More Definite Statement Pursuant to Rule 12(e) (Doc. No. 4) is GRANTED, and Count One is DISMISSED as to those parties. In all other respects the motion is DENIED.